**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CYNTHIA LOVE,** | : | **Civil No.  1:12-CV-1923** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **MICHAEL ASTRUE,** | : | |
| **COMMISSIONER OF** | : | |
| **SOCIAL SECURITY** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM  OPINION

### I.    Statement of Facts and of the Case

#### A.    Introduction

When adjudicating social security appeals, an Administrative Law Judge (ALJ) typically must make three factual determinations, factual findings which in turn often define the legal outcome in a case.  First, the ALJ must assess the credibility of the claimant.  Second, the ALJ must determine the degree to which medical opinions accurately encapsulate the claimant's limitations.  Third, the ALJ must develop a residual functional capacity assessment for the claimant which accurately embraces the impairments and limitations credibly experienced by the claimant.

1

The ALJ performs these fact-finding tasks guided by regulations, regulatory guidance and case law, all of which describe the role of the ALJ in this process and define for the courts a deferential standard of review when evaluating these fact-bound determinations.  We are reminded of these legal tenets in this case where we are asked to evaluate an Administrative Law Judge's (ALJ) decision denying social security disability benefits to the plaintiff, Cynthia Love.  In this case, the ALJ's decision was made against a factual backdrop marked by conflicting evidence relating to the nature, severity and disabling effect of Ms. Love's medical conditions.  Much of this evidence cast doubt upon the claimant's credibility and seemed to undermine this disability claim.  Upon consideration of this evidence, for the reasons set forth below, we conclude that the ALJ's decision is supported by substantial evidence which is adequately explained on the record and, therefore, this decision will be affirmed.

## B.    <u>Love's Medical and Employment History</u>

On July 29, 2009, Cynthia Love applied for Social Security Disability Insurance Benefits ("DIB") under Title II, of the Social Security Act, alleging that she could no longer work any job in the national economy since January 25, 2009.  (Tr. 123-29.)  According to Love she had become disabled due to the cumulative effects of myalgia, myositis, plantar fascial fibromatosis, degenerative discs disease and

carpal tunnel syndrome.  (Tr. 13, 151.)[1] At the time of the alleged onset of this disability, Love was 47 years old, which is defined as a younger individual, age-45-49, had a 9th grade education, and had a prior work history as a packager and bar attendant.  (Tr. 16, 150-57.)

In presenting this claim of total disability, Love's credibility encountered an immediate obstacle:   At her disability hearing, Love acknowledged collecting unemployment benefits, which are premised upon the claimant's assertion that she is able to work, at the same time that Love was insisting that she was totally disabled, and unable to pursue gainful activity.  (Tr. 25.)

Love also came before the ALJ as an individual with a documented, longstanding opiate dependency. (Tr. 29-30.) Moreover, when questioned about this opiate use during her August 6, 2010, disability hearing, and specifically questioned concerning her past heroin use, Love provided inconsistent answers to the ALJ, first stating that she had not experimented with this narcotic drug for more than 20 years, and then acknowledging heroin use within the past three months.  (Tr. 29-30.)[2]

---

[1]Myalgia refers to muscle pain.  Myositis is a medical term for muscle inflammation.  Plantar fibromatosis is a painful mass, or nodule, that affects the tendons of the feet.

[2]Love's efforts to reconcile these inconsistencies was also particularly troubling.  When questioned about medical notes which indicated that she has been regularly using heroin as her drug of choice in 2009, Love explained at the

Love's medical records revealed that her use of opiates and other narcotics was a recurring theme, and concern, for her care givers.  Thus, as early as January 2009, Love's physician was advising that "she should be able to take less hydrocodone." (Tr. 228.)  Later, in October 2009, Love saw her treating physician, Dr. Hartman, (Tr. 295-96.), and reported "that her back was feeling good, but she did not want it to get bad." (Tr. 296.)  Medical staff administered a urine screen to Love during this visit, (Tr. 296.), which tested positive for hyrdocodone and mydromorphine, but negative for oxycodone.  (Tr. 299.)  As a result of this positive drug test, Love's physician reviewed their drug abuse policy with the plaintiff and instructed her regarding the treatment goals associated with long-acting opiates.  (Tr. 298.)  Two months later, in December 2009, Love began Suboxone[3] treatment at the Shepherdstown Family Practice.  (Tr. 311-22.)  In the course of this treatment program, Love identified her drugs of choice as heroin or oxycontin, (Tr. 316.), stating that she used four to five packs of heroin a day, whenever she could obtain  it, (Tr. 322.), and disclosing that she had used heroin three weeks prior to her treatment at Shepherdstown.  (Id.)

---

ALJ hearing that she had lied to her doctor about this heroin use in order to obtain Suboxone, a prescription medication, from that doctor.  (Tr. 37-8.)  Thus, Love described herself under oath to the ALJ as an opportunistic dissembler, who would lie to doctors about her physical condition to obtain drugs.

[3]Suboxone is a medication approved by the FDA for the treatment of opiate dependence.

As for Love's other underlying medical conditions, from 2009 through 2011, she was seen and treated by Dr. Stuart Hartman on numerous occasions. Dr. Hartman repeatedly documented unremarkable and benign findings during these physical examinations of Love. (Tr. 217, 222, 227, 331-32, 339-40, 343-44.) Thus, throughout 2009 and 2010, Dr. Hartman observed that Love's condition was "stable on [her] medications" (Tr. 218, 223, 228, 233, 238, 242, 245, 249, 295, 298, 301, 304, 306, 332, 336, 340.) Dr. Hartman also repeatedly opined in his treatment records that Love was "able to return to [her] normal occupation with minimal limitation" from January 2009 to May 2011. (Tr. 15, 217, 222, 227, 232, 237, 241, 245, 249, 294, 297, 300, 302, 305, 331, 339.)

Love's own reported activities of daily living also supported a finding that she had some capacity for gainful activity. While Love reported that she spent "90 percent" of the day sitting down, (Tr. 39.), Love also stated that she drove, vacuumed, washed dishes, did the laundry, cooked, shopped for groceries alone, took care of the family dog, and attended church weekly. (Tr. 35-6, 176-78.). In addition, Love testified that two weeks prior to the administrative hearing she traveled to the beach, which was approximately two and a half hours from her house, albeit with two breaks. (Tr. 34.)

It was against this backdrop that, on June 28, 2010, Dr. Hartman prepared a physical capacities evaluation for Love in connection with these disability proceedings. (Tr. 308-310.) For the most part, this evaluation revealed that Love retained the capacity for performing sedentary work.[4] Thus, Dr. Hartman found that Love could lift 10 pounds; could engage in grasping, reaching, pulling, pushing and fine manipulation; and could occasionally bend, squat, stoop and carry. (Id.) Dr. Hartman also found that Love had the ability to drive, shop, travel without assistance, ambulate, climb stairs, and engage in a full array of activities of daily living. (Id.) Indeed, the only aspect of Dr. Hartman's evaluation which was at all problematic in terms of her continued employment in sedentary work was his notation that she could not operate foot controls, and his indication that she could only sit for a 4 hour period during the workday. (Tr. 308.)

## C.    The ALJ Hearing and Decision

Having received this equivocal and contradictory evidence regarding Love's physical condition, the ALJ conducted a hearing on August 6, 2010. (Tr. 21-54.) At this hearing, Love testified, providing contradictory accounts of her heroin use, admitting that she had lied to at least one physician in the past in order to obtain

---

[4]Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a).

drugs, and giving an equivocal account of the degree to which her medical conditions were wholly disabling. (Tr. 26-45.) A vocational expert (VE) also testified. (Tr. 46-53.) In this VE testimony, the expert addressed a series of hypothetical questions posed by the ALJ, hypotheticals relating to a 48 year old, with a 9th grade education, who could sit for 6 hours a day, and stand or walk for one hour each workday, who was limited to lifting or carrying 10 pounds, had no limitations on hand and finger manipulation, but could bend and squat occasionally, and whose leg movements were restricted to occasional movements for the right leg but unlimited movement of the left leg. (Tr. 46.) Presented with this hypothetical, the VE opined that a person with this constellation of conditions could work at a number of sedentary occupations. (Tr. 47-48.) The VE conceded, however, that if this hypothetical worker could not sit, stand or walk for 8 hours a day, then she would be disabled. (Tr. 49-50.)

Following this hearing, on November 1, 2010, the ALJ issued his decision denying Love's application for benefits. (Tr. 8-20.) After reviewing the medical evidence, and Love's one contradictory accounts, the ALJ found that Love was not wholly credible in her descriptions of the degree and severity of her pain. The ALJ detailed the factual basis for this conclusion in the opinion, noting at length how Love's subjective complaints did not match objective medical testing, or the treatment records provided by her care givers. (Tr. 14-15.)

7

The ALJ further found that Love suffered from the following conditions that, while severe, did not meet any of the listing criteria which would qualify Love for benefits at step 3 of the five step Social Security disability assessment process: myalgia, myositis, plantar fascial fibromatosis, degenerative discs disease and carpal tunnel syndrome.  (Tr. 13.)  The ALJ then concluded that Love retained the ability to perform sedentary work, with the following limitations:  Love could sit for 6 hours a day, and stand or walk for one hour each workday; was limited to lifting or carrying 10 pounds; had no limitations on hand and finger manipulation; could bend and squat occasionally; and Love's leg movements were restricted to occasional movements for the right leg but unlimited movement of the left leg.  (Tr. 14.)  For the most part this residual functional capacity assessment incorporated the limitations recommended by Dr. Hartman in his physical capacity assessment, (Tr. 308-310.), and was consistent with the objective medical records provided to the ALJ, records which consistently reported that Love was "able to return to [her] normal occupation with minimal limitation" from January 2009 to May 2011.  (Tr. 15, 217, 222, 227, 232, 237, 241, 245, 249, 294, 297, 300, 302, 305, 331, 339.)

Where the ALJ did not adopt particular medical limitations described by Dr. Hartman, the ALJ articulated specific reasons for not doing so.  For example, the ALJ explained that he did not limit Love to 4 hours sitting per day at work, because Love

had testified that she currently was able to sit 90% of the day, testimony which suggested a greater tolerance for extended periods seated than that acknowledged by Dr. Hartman. (Tr. 16.) Similarly, the ALJ declined to adopt the full extent of the foot manipulation restrictions suggested by Dr. Hartman because the ALJ found that the doctor's opinion did not distinguish between right and left foot movements, a distinction that drew significant support from the record before the ALJ, which revealed that Dr. Hartman only documented significant findings with regard to Love's right foot and leg during physical examinations. (Tr. 305, 331-32, 335, 339-40, 343, 347.)

Having made these findings the ALJ then concluded at step 5 of the analytical process that Love could perform sedentary work. (Tr. 16.) Therefore, the ALJ found that Love was not disabled and denied her application for disability benefits. (Id.)

This appeal followed. (Doc. 1.) The parties have now fully briefed this matter, with the plaintiff arguing on appeal: (1) that the ALJ erred in finding that Love lacked credibility; (2) that the ALJ erred in failing to give appropriate weight to all of the physical limitations found by Love's treating physician; and (3) that the residual functional capacity (RFC) assessment of the ALJ was incomplete and erroneous because it did not fully incorporate all of Love's claimed medical

limitations.  (Docs. 9 and 11.)  The Commissioner has responded to these arguments, (Doc. 10.), and this case is now ripe for resolution.

For the reasons set forth below we find that substantial evidence supports the ALJ findings in this case; that those findings are adequately explained on the record; and that the findings reflect an appropriate assessment of all of the medical evidence. Therefore, this appeal will be denied.

II.    **Discussion**

A.    **Standards of Review–The Roles of the Administrative Law Judge and This Court**

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the Administrative Law Judge (ALJ) and this Court.  At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.  To receive disability benefits, a claimant must present evidence which demonstrates that the claimant has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits.  See 20 C.F.R. § 404.1520.  See also Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  If the ALJ finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  See 20 C.F.R. § 404.1520.  As part of this analysis the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  See 20 C.F.R. § 404.1520.

11

This disability determination also involves shifting burdens of proof. The initial burden rests with the claimant in steps 1 through 4 to demonstrate that he is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding. In undertaking this task, this Court

applies a specific, well-settled and carefully articulated standard of review.   In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review.  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, we must simply determine whether the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); see also Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)." Johnson, 529 F.3d at 200. See also Pierce v. Underwood, 487 U.S. 552 (1988). It is less than a preponderance of the evidence but more than a mere scintilla of proof. Richardson v. Perales, 402 U.S. 389, 401 (1971).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)(quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.').” Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

14

### B.    The ALJ's Decision Was Supported By Substantial Evidence

Judged against this deferential standard of review we find that the ALJ's disability decision in this case was supported by "substantial evidence" and, therefore, may not now be disturbed.  Indeed, given the evidence undermining Love's credibility, and the many conflicting and contradictory threads in the evidence presented to the ALJ, this ruling reflects a thorough, careful, balanced analysis of the proof.  It is, therefore, the paradigm of a decision which draws carefully upon substantial evidence.

Having reached this conclusion, we discuss the separate claims of error advanced by Love in this appeal.

### 1.    The ALJ's Credibility Assessment is Supported by Substantial Evidence

At the outset, contrary to the plaintiff's assertion, we find that substantial evidence supports the ALJ's determination that Love's testimony regarding the degree and persistence of her pain was not fully credible is supported by substantial evidence. Any assessment of Love's credibility must begin by acknowledging a fundamental contradiction:  Love sought disability benefits claiming she was unable to work at the same time that she collected unemployment compensation premised upon the assertion that she could work.  While we agree that this contradiction does not automatically disqualify Love from receiving disability benefits, (Doc. 11.), this contradiction is

profound and may properly profoundly affect Love's credibility.  Indeed, in assessing a claimant's credibility: "it was entirely proper for the ALJ to consider that [the claimant's] receipt of unemployment benefits was inconsistent with a claim of disability during the same period.  See, e.g., Johnson v. Chater, 108 F.3d 178, 180 (8th Cir.1997) (application for unemployment compensation benefits can adversely affect a claimant's credibility because of admission of ability to work required for unemployment benefits)."  Myers v. Barnhart, 57 F. App'x 990, 997 (3d Cir. 2003).

In any event:  "[A]lthough '[t]estimony of subjective pain and inability to perform even light work is entitled to great weight,' Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir.1979), an ALJ may nonetheless reject a claim of disabling pain where he 'consider[s] the subjective pain and specif[ies] his reasons for rejecting these claims and support[s] his conclusion with medical evidence in the record.' Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir.1990)." Harkins v. Comm'r of Soc. Sec., 399 F. App'x 731, 735 (3d Cir. 2010).  Where a disability determination turns on an assessment of the level of a claimant's pain, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529.  Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  Cases involving an assessment of

subjective reports of pain "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id. In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's disability. Instead. at the outset, by statute the ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence. . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.

17

20 C.F.R. § 404.1529 (a)-(c).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529 (a)-(c).  In so doing, the medical evidence of record is considered along with the claimant's statements.  20 C.F.R. § 404.1529 (a)-(c).  Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding his symptoms:  "In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. SSR 96-4p provides that "Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered

with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s)." SSR 96-4p.

Here the ALJ followed this statutory and regulatory guidance when assessing Love's claims of pain. As we have noted this decision involved an assessment of conflicting and equivocal medical testimony by a claimant who sought disability benefits at the same time that she collected unemployment compensation based upon her claim that she was able to work. See Myers v. Barnhart, 57 F. App'x 990, 997 (3d Cir. 2003). Moreover, Love contradicted herself during her testimony on a material matter, past heroin use, and then attempted to reconcile these contradictions, in part, by stating that she had in the past lied about heroin use to a doctor in order to try to obtain other drugs from that physician.

Furthermore, the evidence showed that the plaintiff's subjective complaints often were not fully supported by independent diagnostic evidence and testing, or by the observations of her treating physician who described Love's condition was "stable on [her] medications" (Tr. 218, 223, 228, 233, 238, 242, 245, 249, 295, 298, 301, 304, 306, 332, 336, 340.), and repeatedly opined that Love was "able to return to [her] normal occupation with minimal limitation" from January 2009 to May 2011. (Tr. 15, 217, 222, 227, 232, 237, 241, 245, 249, 294, 297, 300, 302, 305, 331, 339.)

19

Since "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged," 42 U.S.C. § 423(d)(5)(A), the results of these diagnostic tests, which did not confirm the type of abnormalities which would sustain the plaintiff's reports of pain, constituted "substantial evidence" supporting the ALJ's finding.

Similarly, the ALJ's assessment of the competing medical evidence rested upon sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Johnson, 529 F.3d at 200, and, therefore, was supported by "substantial evidence."  In this case, the ALJ correctly noted Love's lack of credibility and properly concluded that the plaintiff's complaints were not consistently supported by medical treatment records, or by her own description of her medical and mental condition. Given these conflicts in the evidence, the ALJ as fact-finder was entitled to give greater weight to this other objective medical evidence, objective evidence which did not support these claims of total disability.  Recognizing that the "substantial evidence" standard of review prescribed by statute is a deferential standard of review, Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), which is met by less than a preponderance of the evidence but more than a mere scintilla of proof, Richardson v. Perales, 402 U.S.

389, 401 (1971), we find that the ALJ's decisions assessing this competing proof regarding the plaintiff's's ability to function despite her various claimed physical impairments was supported by substantial evidence and may not now be disturbed on appeal.

Finally, Love argues that the ALJ erred as a matter of law in finding her claims of intractable pain were not fully credible, while relying upon Love's statement that she sat at home 90% of the time to determine that Love could sit at least six hour each workday. Love characterizes the ALJ's approach to this credibility assessment, which chose to credit some of Love's testimony while discounting other testimony, as improper and inconsistent. In effect, Love invites us to substitute our judgment for the judgment on the ALJ in making this credibility assessment, and urges us to adopt a categorical rule requiring an ALJ to accept Love's testimony in its totality.

We will decline this invitation to impose an all-or-nothing approach upon ALJs when assessing questions of credibility. At the outset, we note that the ALJ is uniquely well-poised to make these credibility assessments having actually met Love and observed her testimony. Moreover, as a legal matter "[t]he ALJ, . . ., 'has the right, as the fact finder, to reject partially, or even entirely, [a claimant's statements] if they are not fully credible.' Weber v. Massanari, 156 F.Supp.2d 475, 485 (E.D.Pa.2001) (citing Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir.1974))." Schuster v. Astrue, 879 F.

Supp. 2d 461, 470 (E.D. Pa. 2012).   Here, the ALJ made such credibility determinations, finding that Love was not credible when she stated that her pain was so severe that it prevented her from working, but also concluding that Love testified truthfully when she stated that she often sat for much of the day.   This credibility determination, which found that Love was inclined to overstate her symptoms, permitted the ALJ to both reject Love's claims of disabling pain, while crediting those portions of Love's testimony which supported a finding that she was able to sit for extended periods and, therefore, was not disabled from performing sedentary work which requires frequent sitting.   Since"[t]he ALJ has discretion to 'evaluate the credibility of a claimant and ... arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged....' Brown v. Schweiker, 562 F.Supp. 284, 287 (E.D.Pa.1983) (internal quotations omitted)," Cerrato v. Comm'r of Soc. Sec., 386 F. App'x 283, 286 (3d Cir. 2010), this credibility assessment, which made informed judgments regarding Love's believability, taking into account Love's motive to both overstate her disabilities while understating her abilities, was entirely appropriate and was supported by substantial evidence. Therefore, there was no error in this credibility assessment by the ALJ.

## 2.   The ALJ Appropriately Considered the Opinion Evidence

Love also argues that the ALJ erred in failing to give appropriate weight all aspects of the opinion of her treating physician.  In particular, Love alleges that the ALJ erred in not adopting those aspects of her treating physician's opinion which would have limited her foot movements and restricted her ability to sit for more than 4 hours per day while at work.  In this regard, the legal standards governing our assessment of an ALJ's evaluation of this type of evidence are familiar ones.  In Morales v. Apfel, 225 F.3d 310  (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a physician stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer [v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)] (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987)); see also Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir.1994); Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir.1989); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Brewster, 786 F.2d at 585.  Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).  The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See Adorno, 40 F.3d at 48.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory

23

medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.  Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Kent, 710 F.2d at 115.

Id. at 317-318.

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R.  § 416.927(c).  When the opinion of a physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered.  The Regulations state:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

20 C.F.R.  § 416.927(c).

Additionally, the nature and extent of the doctor-patient relationship is considered.  The Regulations state:

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or

24

ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R.  § 416.927(c).

Given this recognition of the great weight that should attach to the professional judgment of treating physicians, an ALJ must provide an adequate explanation for any decision which chooses to disregard a treating physician's findings regarding illness, impairment and disability. Thus, as one court has aptly observed:

> "An ALJ may not reject a physician's findings unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir.1993) (internal quotation marks, citations and indication of alteration omitted). Where the findings are those of a treating physician, the Third Circuit has "long accepted" the proposition that those findings "must [be] give[n] greater weight ... than ... the findings of a physician who has examined the claimant only once or not at all." Id. (citations omitted) An ALJ may reject a treating physician's opinion on the basis of contradictory medical evidence, see Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988), and may afford a medical opinion more or less weight depending upon the extent to which supporting explanations are provided, see Mason, 994 F.2d at 1065 ("[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"), and whether the reporting doctor is a specialist, see Id. at 1067. An ALJ may not, however, reject medical determinations by substituting his own medical judgments. See Frankenfield, 861 F.2d at 408.

Terwilliger v. Chater, 945 F.Supp. 836, 842-3 (E.D.Pa.1996).

In this case we find that the ALJ's decision did afford due deference to Love's treating physician's opinion. Indeed, that opinion, which generally found Love capable of performing sedentary work, was given substantial weight by the ALJ, and many of the limitations suggested by Dr. Hartman were expressly incorporated by the ALJ into Love's residual functional capacity assessment.

Furthermore, where the ALJ did not adopt particular medical limitations described by Dr. Hartman, the ALJ articulated specific reasons for not doing so.  For example, the ALJ explained that he did not limit Love to 4 hours sitting per day at work, because she had testified that she currently was able to sit 90% of the day.  (Tr. 16.)  Similarly, the ALJ declined to adopt the full extent of the foot manipulation restrictions suggested by Dr. Hartman because the ALJ found that the doctor's opinion did not distinguish between right and left foot movements, a distinction that drew significant support from the record before the ALJ, which revealed that Dr. Hartman only documented significant findings with regard to Love's right foot and leg during physical examinations.  (Tr. 305, 331-32, 335, 339-40, 343, 347.)  Finally, the ALJ's conclusion that Love could perform sedentary work was entirely consistent with Dr. Hartman's contemporaneous treatment notes, which repeatedly stated that Love was

"able to return to [her] normal occupation with minimal limitation" from January 2009 to May 2011.  (Tr. 15, 217, 222, 227, 232, 237, 241, 245, 249, 294, 297, 300, 302, 305, 331, 339.)

Viewed in this light, we find that the ALJ did not err in giving substantial weight to many aspects of the opinion of Love's treating physician which found that Love could perform sedentary work, while declining to follow that opinion in two narrow respects where the opinion was inconsistent with other objective evidence, including the doctor's own frequent observation that Love could "return to [her] normal occupation with minimal limitation."

### 3.   The ALJ Did Not Err in Formulating a Residual Functional Capacity for Love

Finally, Love argues that the ALJ erred in formulating a residual functional capacity for Love which did not fully incorporate all of her subjective complaints, and all of the recommendations suggested by her treating physician.  This argument, which largely recasts Love's prior claims regarding the ALJ's credibility determinations, warrants only brief consideration on appeal.

" ' "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." ' Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir.2000) (quoting Hartranft, 181

F.3d at 359 n. 1); see also 20 C.F.R. § 404.1545(a)." Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001). In conducting this assessment "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001). An ALJ must also "explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). Therefore:

> Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. See Plummer, 186 F.3d at 429; Cotter, 642 F.2d at 705. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter, 642 F.2d at 705.

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000).

In examining this issue, though,"[w]e do not require an ALJ to submit [in an RFC] to the vocational expert every impairment *alleged* by a claimant." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)(emphasis in original). Rather, the ALJ must simply "accurately convey [in an RFC] to the vocational expert all of a claimant's *credibly established limitations."* Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005), citing Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999)(emphasis in original). Therefore, in making this assessment and framing a proper hypothetical

question for a vocational expert, "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but 'cannot reject evidence for no reason or for the wrong reason' (a principle repeated in <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993); Reg. § 929(c)(4))." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005).

In this case, we find that the residual functional assessment made by the ALJ fully comported with these legal requirements. In this regard, we note that, in making this residual functional capacity determination, the ALJ can, should, and must make credibility assessments. Here, the ALJ made such determinations regarding the extent to which Love's claims were credible. For reasons that were good and sound, and fully supported by the evidence, the ALJ found that Love's complaints regarding the severity of her pain were not fully credible. The ALJ also found that the observations made by Love's treating physician, who for the most part found that Love could perform sedentary work, were credible. The ALJ then simply discounted two restrictions suggested by the treating doctor, restrictions which were not fully supported by objective evidence, in formulating this residual functional capacity assessment.

This action by the ALJ does not constitute an abuse of discretion, as Love suggests. Rather, it reflects the informed exercise of judgment and discretion in the

fact-finding process.  In short, we find that the record in this matter shows that the claimant's complete medical history was adequately developed, but that medical history justified the ALJ's finding that Love was not disabled.  Recognizing that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)," Johnson, 529 F.3d at 200; and consists of less than a preponderance of the evidence but more than a mere scintilla of proof, Richardson v. Perales, 402 U.S. 389, 401 (1971); we conclude that there was substantial evidence which supported the ALJ findings in this case. Therefore, those findings should not be disturbed on appeal.

### III.   Conclusion

Accordingly, for the foregoing reasons, IT IS ORDERED that the Commissioner's decision is upheld, and the clerk is directed enter judgment for the defendant and close this case.  An appropriate order will follow.

So ordered this 30th day of September, 2014.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge